02-10-089-CV
















 

 

 

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

 

NO. 02-10-00089-CV

 

 


 
 
 IN THE INTEREST OF T.S., B.S., B.S., AND T.S.,
 CHILDREN
 
 
  
 
 
  
 
 


 

 

------------

 

FROM
THE 325TH DISTRICT COURT OF TARRANT COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

 

I.  Introduction

Appellants T.O. (Mother) and B.S.
Sr. (Father) appeal the termination of their parental rights to their children,
T.S., B.S., B.S. Jr., and T.S.  The trial
court found by clear and convincing evidence that Appellants had (1) knowingly
placed or knowingly allowed the children to remain in conditions or
surroundings that endangered their physical or emotional well-being, and (2)
engaged in conduct or knowingly placed the children with persons who engaged in
conduct that endangers the children’s physical or emotional well-being.  See
Tex. Fam. Code Ann. § 161.001(1)(D), (E) (Vernon Supp. 2010).  The trial court also found that termination
of the parent-child relationship would be in the children’s best interest.  See id. § 161.001(2).

In two points, Father challenges
the legal and factual sufficiency of the evidence supporting the trial court’s
endangerment findings.  In three points,
Mother challenges the legal and factual sufficiency of the evidence supporting
the trial court’s endangerment findings and argues that it was an abuse of
discretion for the judge of the 324th District Court to hear the case while the
325th District Court continued to have jurisdiction.  Because we hold that the 324th District Court
did not abuse its discretion by hearing the case while the 325th District Court
continued to have jurisdiction, we overrule that issue.  Further, because we hold that the evidence is
legally and factually sufficient to support the endangerment findings against
both Mother and Father, we affirm the trial court’s judgment as to the
termination of their parental rights.  

II. Factual and Procedural Background

 

A. DFPS’s
Investigation

Mother and Father have been in an
off-and-on relationship for over eleven years, at times living in separate
residences.  They have four children
together, T.S., born February 3, 2004, B.S. and B.S. Jr., born February 10,
2007, and T.S., born June 20, 2008.  This
family was first referred to the Texas Department of Family and Protective
Services (DFPS) in February 2007, when Mother showed up for a medical
appointment with a scratch on her face. 
Mother admitted that she had received the scratch during an altercation
with her mother while Mother was eight months pregnant with the twins.  The twins were born the next day, one month
premature.  There is also evidence that
Father had assaulted Mother while she was pregnant with the twins.  Father pleaded guilty to assaulting Mother by
“striking or dragging her with his hand.” 


DFPS was contacted again in July
2007, after Mother assaulted another woman at the children’s daycare.  During the altercation, Mother bit the other
woman in the abdominal area, obtained an object to use as a weapon, and caused
property damage to the daycare by removing a sink.  A staff member at the daycare was injured when
she tried to stop Mother from attacking the other woman.  The DFPS investigator ruled that there was reason
to believe neglectful supervision by Mother. 
A daycare employee testified that the children would sometimes come to
the daycare dirty and smelling so bad that the daycare staff would have to
bathe them.  Because the parents’ case
was still ongoing, the investigator took no action other than offering
resources.  DFPS offered parenting
classes, therapy, anger management, and referrals for assistance with food
stamps and Temporary Assistance for Needy Families (TANF).  Mother and Father did not participate in these
offered services.

When T.S. was born in June 2008, the
hospital notified DFPS that Mother was “exhausted and overwhelmed and possibly
unable to care for her 3 children that reside at home.”  The investigator discovered that Mother was
selling her food stamps and living illegally with her mother, who was in
Section 8 housing.  The investigator
found that there was reason to believe physical neglect by Mother.  Despite concerns that Mother was once again
living with her mother—a person with whom she had a history of physical
violence—DFPS continued to allow the children to remain with Mother.  The case was designated “Intensive” and assigned
to Family Preservation Services.

In September 2008, believing that
the family was at high risk for removal of the children, DFPS interviewed
Mother and Father to assess their qualifications for Family Based Safety
Services.  This program offered financial
assistance to the parents.  Mother seemed
willing to discuss her need for a monthly stipend for rent, diapers, and other
items, as well as her need for money for furniture.  At this point, she had moved and the DFPS
worker found her and the four children living in a house with no furniture
other than a king-sized bed. 
Approximately a week later, Mother was arrested and jailed.

Mother’s incarceration was the
result of another violent incident with her mother.  The children had been playing outside when
Mother and her mother got into a fight. 
When the children entered the house, Mother picked up one of them in an
attempt to get her mother to stop hitting her. 
Mother testified she did not fight back because she did not want the
children seeing her hit their grandmother. 
Nonetheless, Mother bit her mother. 
Mother was then arrested.

While Mother was in jail, Father
was the sole caregiver of all four children.  DFPS found Father in a sparse apartment with
no diapers for the children.  Father had
tied shirts around the twins’ waists to serve as diapers, but the shirts were
full of waste, and Father had nothing for them to change in to.  Father did not have a job and, therefore, had
no financial ability to buy necessities for the children.  DFPS provided food, formula, and clothing to
Father for the children.  Even after the
clothing was furnished to Father, the DFPS worker found the children dressed
only in diapers or t-shirts and diapers at her visits.

The DFPS investigator also
witnessed Father “propping” the infant’s bottle up while she drank,
which is dangerous and could lead to choking. 
The investigator instructed Father not to prop the bottle.  When she returned the next day, Father was
still propping the bottle.  He admitted that
he knew it was dangerous but he “didn’t know what else to do.”  The worker also returned to the house in
October 2008 to find the bottle propped in the mouth of T.S. while under the
care of Father.

The investigator saw that Father
was overwhelmed caring for four small children by himself, but she testified
that she did not see any “red flags” indicating she should remove the children
from his care.  The children appeared to
be happy and to love their father.  DFPS
noted that Father “really wanted the help. 
He wanted to be able to provide for the children.  He tried very hard.  He was just very overwhelmed with having four
children.  He really wanted them, really
wanted to do what was right for them.” 
DFPS recommended parenting skills classes.  Father had a Women, Infants, and Children
Food Assistance Program (WIC) card but, because he was not listed as a person
who could use it, he was unable to purchase items with it.  Father did not have an ID to get on the WIC
account or to get food stamps, and he had failed to obtain an ID card.  Father also did not go to the daycare to
complete the necessary paperwork to enroll the children.

Father was arrested in October 2008
and charged with robbery and aggravated robbery.  Before his arrest, Father had informed the DFPS
investigator that he believed he had a warrant for his arrest for failure to
report for his probation appointment and for engaging in additional criminal
activity.  After he was arrested, he used
his allotted phone call to call the investigator to retrieve the children.  All four children were sent to a foster
family, with whom they still reside.  DFPS
sent a letter to Father while he was incarcerated outlining the requirements of
his service plan.  Father claims to have never
received it, and DFPS could not verify its receipt.

When Mother was released from jail,
DFPS gave her a service plan, which required various classes and therapies.  Mother completed the classes in parenting,
domestic violence, and anger management, and she consented to a psychological
evaluation.  Mother said she learned a
lot, but at trial she could not recall anything specific that she learned.  As a result of her apparent progress, the
trial court granted Mother temporary possessory conservatorship as recommended
by DFPS.  The children were to be
returned to her based in part on her representation that she held a job.  Mother told DFPS that she could not take the
children full time because she was working at USA Janitorial Services during
the week.  In fact, she was not working
there at the time, and it is unclear if she ever did work there or for how
long.  Instead, the evidence showed that Mother
had been posing for risqué pictures that were supposed to appear in a magazine
but were also posted on a website. 
Mother even acknowledged that she had misled the trial court at the
hearing to get her children back by stating that she was working at USA
Janitorial Services when she was not.  Based
on Mother’s representations, DFPS was going to provide daycare for the
children, but until that was arranged, she would get weekend visits, and the
children would spend the week with their foster family.  When DFPS found out that Mother was not
employed at USA Janitorial Services, they informed her that she would be
getting the children full time.  Mother
also admitted that she told the food stamps office that she was unemployed
while she was working so she could get food stamps.  She applied for food stamps on an emergency
basis the first weekend she had the children although she acknowledged that she
had food that had been sent by the foster family.  When DFPS told her that she could still get
food stamps even if she was employed, she responded that “she never tells them
she’s working.  She’s always told them
that she didn’t have employment.”  

DFPS also agreed to a list of
approved caretakers to assist Mother in watching the children, including Mother’s
sister.  Despite the fact that the children’s
maternal grandmother was not on the list and was an alcoholic, Mother
repeatedly left the children with their grandmother.  Mother told DFPS she thought it was okay to
leave the children with her mother as long as another person was also
present.  

At the final weekend visit, DFPS
claimed that Mother “didn’t appear excited” about getting her children for the
weekend.  Mother asked the DFPS worker if
it would be all right if she would not be at home on Monday morning when DFPS
came to retrieve the children and if instead, her sister would be watching
them.  DFPS approved.  That Monday, Mother was not at home when DFPS
arrived, but neither was her sister.  The
children were with a woman named “Red,” whom the oldest child told DFPS had
watched them that weekend.  “Red” was a
friend of Mother’s who also had posed for pictures that had appeared on the same
website as the pictures of Mother.  The
sister entered the apartment soon after DFPS’s arrival.  

The next day, a man who identified
himself as Mother’s employer called DFPS and told them he had hired Mother that
weekend and had flown her to California to work for his company, which produces
pornographic films.  He told DFPS that
Mother would be required to fly to California every other week for training in
video editing, and that other travel in Texas, Oklahoma, and Louisiana would be
required.  Mother claimed that after
watching a video shoot, she decided not to return to California because she
“[d]idn’t want to be in any trouble.”  

DFPS changed their plan for this
family to termination and filed a motion to modify possessory conservatorship
in an emergency after learning of Mother’s absence on her weekend visit and the
reason for her absence.  According to the
children’s service plans, the twins, B.S. and B.S. Jr., were developmentally
delayed and had asthma.  At one year of
age, they were unable to talk or chew food. 
B.S. was diagnosed as failure to thrive. 
The infant, T.S., was described as being “stiff when held.”  However, the children have adjusted well to
their foster family.  DFPS’s plan is for
them to be adopted permanently by their foster family.  

B. Criminal
History

Mother was charged with two crimes
as a result of the assault at the daycare. 
She pleaded guilty on September 21, 2007, to criminal mischief and
assault with bodily injury and received deferred adjudication probation.  On September 6, 2008, Mother again committed
an assault and on October 7, 2008, was convicted of that offense upon a plea of
guilty.  Her guilt was adjudicated and her
probation was revoked in her previous cases. 
Her admitted repeated misrepresentations to obtain food stamps also
suggests criminal conduct. 

Father’s criminal record was, in
large part, proved up by criminal records admitted at trial.  At the time of trial, Father was incarcerated
and awaiting trial for multiple alleged offenses.  Father had been placed on four years’
probation in October 2001 for robbery by threats, and the probation had been
revoked on August 5, 2003.  Father
committed burglary of a vehicle on May 20, 2003, and was convicted for that
offense on August 7, 2003.  These
convictions form the basis of the pending enhancement to the indictments
against him at the time of trial.

Mother testified that Father
assaulted her when she was approximately four months pregnant with the
twins.  He was convicted of that assault
in November 2006.  Mother also testified
that soon before the twins were born, Father was in jail in Corsicana for
possessing marihuana.  Father also tested
positive for marihuana on the first drug test administered by DFPS in July
2007.  At the time of trial, Father was
under indictment for aggravated robbery with a firearm and robbery, both
charges with enhancement paragraphs, and he was also charged with misdemeanor
theft.  Father had been in jail for
sixteen months when this case was tried on February 25, 2010.

III.  Legal and Factual
Sufficiency

A. Standards
of Review

Both Mother and Father complain
that the evidence presented at trial is legally and factually insufficient to
support the court’s termination of their parental rights under section 161.001
of the Family Code.  A parent’s rights to
“the companionship, care, custody, and management” of his or her children are
constitutional interests “far more precious than any property right.”  Santosky v. Kramer, 455 U.S. 745,
758–59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547
(Tex. 2003).  “While parental rights are
of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.” 
In re C.H., 89 S.W.3d 17, 26
(Tex. 2002).  In a termination case, the
State seeks not just to limit parental rights but to erase them permanently—to
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (Vernon
2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination
proceedings and strictly construe involuntary termination statutes in favor of
the parent.  Holick, 685 S.W.2d at
20–21; In re M.C.T., 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no
pet.).

In proceedings to terminate the
parent-child relationship brought under section 161.001 of the family code, the
petitioner must establish one ground listed under subsection (1) of the statute
and must also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; In re J.L.,
163 S.W.3d 79, 84 (Tex. 2005).  Both
elements must be established; termination may not be based solely on the best
interest of the child as determined by the trier of fact.  Tex. Dep’t of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987).  In this
case, the State alleged proof under subsections (D) and (E) of section 161.001
of the family code.  Those sections state
that the court may order termination of the parent-child relationship if the
court finds that the parent has either “knowingly placed or knowingly allowed
the child to remain in conditions or surroundings which endanger the physical
or emotional well-being of the child” or “engaged in conduct or knowingly
placed the child with persons who engaged in conduct which endangers the
physical or emotional well-being of the child.”  Tex. Fam. Code Ann. § 161.001 (D), (E).

Termination decisions must be
supported by clear and convincing evidence. 
Tex. Fam. Code Ann. § 161.001; see
161.206(a).  Evidence is clear and
convincing if it “will produce in the mind of the trier of fact a firm belief
or conviction as to the truth of the allegations sought to be established.”  Id. § 101.007 (Vernon 2008).  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.  In re J.F.C., 96
S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243 S.W.3d 611,
616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal
sufficiency in parental termination cases, we must determine whether the
evidence is such that a factfinder could reasonably form a firm belief or
conviction that the grounds for termination were proven.  In re J.P.B., 180 S.W.3d 570, 573
(Tex. 2005).  We must review all the
evidence in the light most favorable to the finding and judgment.  Id. 
This means that we must assume that the factfinder resolved any disputed
facts in favor of its finding if a reasonable factfinder could have done
so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable factfinder could, and disregard contrary evidence unless a
reasonable factfinder could not.  Id.

We must therefore consider all of
the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness-credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
factfinder’s province.  Id. at
573, 574.  And even when credibility
issues appear in the appellate record, we must defer to the factfinder’s determinations
as long as they are not unreasonable.  Id.
at 573.

In reviewing the evidence for
factual sufficiency, we must give due deference to the factfinder’s findings
and not supplant the judgment with
our own.  In re H.R.M., 209 S.W.3d
105, 108 (Tex. 2006).  We must determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that the parents violated subsection (D) or (E) of section 161.001(1).  Tex. Fam. Code Ann. § 161.001; C.H., 89
S.W.3d at 28.  If, in light of the entire
record, the disputed evidence that a reasonable factfinder could not have
credited in favor of the finding is so significant that a factfinder could not
reasonably have formed a firm belief or conviction in the truth of its finding,
then the evidence is factually insufficient. 
H.R.M., 209 S.W.3d at
108.

“Endanger” means to expose to loss
or injury, to jeopardize. Boyd, 727
S.W.2d at 533; In re J.T.G., 121 S.W.3d 117, 125 (Tex.
App.—Fort Worth 2003, no pet.).  To prove
endangerment under subsection (D), DFPS had to prove that the parents (1)
knowingly (2) placed or allowed the children to remain (3) in conditions or
surroundings that endangered their physical or emotional well-being. See Tex. Fam. Code Ann. §
161.001(1)(D).  Subsection (D) focuses on
dangerous conditions or surroundings that endanger the physical or emotional
well-being of the children.  In re J.A.J., 225 S.W.3d 621, 625 (Tex.
App.—Houston [14th Dist.] 2006) (op. on reh’g), judgm’t aff’d in part, rev’d in part by 243 S.W.3d 611 (Tex.
2007).  It focuses on the suitability of
the children’s living conditions.  Id. 
Thus, under (D), it must be the environment itself that causes the
children’s physical or emotional well-being to be endangered, not the parent’s
conduct.  Id.

Under (E), the relevant inquiry is
whether evidence exists that the endangerment of the children’s physical
well-being was the direct result of the parents’ conduct, including acts, omissions,
or failures to act.  See J.T.G., 121 S.W.3d at 125; see
also Tex. Fam. Code Ann. § 161.001(1)(E). 
Additionally, termination under (E) must be based on more than a single
act or omission; the statute requires a voluntary, deliberate, and conscious course
of conduct by the parent.  J.T.G., 121 S.W.3d at 125; see Tex. Fam. Code Ann. §
161.001(1)(E).  It is not necessary,
however, that the parents’ conduct be directed at the children or that the
children actually suffer injury.  Boyd, 727 S.W.2d at 533; J.T.G., 121 S.W.3d at 125.  The specific danger to the children’s
well-being may be inferred from parental misconduct standing alone.  Boyd,
727 S.W.2d at 533; In re R.W., 129 S.W.3d 732, 738 (Tex.
App.—Fort Worth 2004, pet. denied).  To
determine whether termination is necessary, courts may look to parental conduct
occurring both before and after the children’s birth.  In re D.M., 58 S.W.3d
801, 812 (Tex. App.—Fort Worth 2001, no pet.). 

[A]
child’s exposure to continually unsanitary living conditions, his continued
uncleanliness, his medical needs and lack of attention thereto, and his
subjection to physically abusive parents are indicia which may prove
endangerment.  He need not develop or
succumb to a malady due to those conditions before it can be said that
endangerment arises.

 

In
re P.E.W., 105 S.W.3d 771, 777
(Tex. App.—Amarillo 2003, no pet.).

B. Sufficient
Evidence Supports Termination Under Sections 161.001(D) and (E)

 

We hold there is legally and
factually sufficient evidence that both parents knowingly placed the children
in physically or emotionally dangerous conditions and that their conduct
endangered the children’s physical well-being. 
Since the evidence pertaining to subsections 161.001(D) and (E) is so
interrelated, we will consolidate our review.

DFPS has been referred three times.
 Twice they have ruled that there is
reason to believe that Mother was neglecting the children.  Mother has a history of abusive and assaultive
behavior that the children witnessed or were made a part of.  She continually placed the children in the
environment where the violence took place.

Mother has not provided stable and
sufficient housing for the children and did not demonstrate a concrete plan to
do so in the future.  She did not put her
children first by initially working her services and only became cooperative
when she was offered financial assistance. 
Although Mother finally participated in her services when she was
released from jail, the evidence was sufficient for the trial court to conclude
that her conduct had, in fact, not improved and would continue to endanger her
children.  The evidence showed that
immediately before the children were returned to the Mother for the weekends,
she posed for partially nude pictures along with her friend “Red.”  Mother lied to the DFPS worker and was not
honest in court as to where she was working when the children were being
returned to her.  She testified that she
was not honest in her answers concerning employment when attempting to obtain
food stamps at that same time.  Even
after working services, Mother allowed the children to be supervised by “Red”
and other unapproved caregivers.  She was
not honest with the worker when the children were delivered on their last
weekend visit as she knew she would not be at home with her children for their
weekend visit.  Instead of staying with
her children, Mother chose to go to California to earn some quick money editing
pornographic films. 

Father has a history of violent
criminal conduct and substance abuse. 
During the time that he was solely responsible for the four children,
Father showed that he was incapable of providing conditions that did not
endanger their physical or emotional well-being and that this environment did,
in fact, create a potential for danger which he was aware of but
disregarded.  See In re S.M.L., 171 S.W.3d 472, 477 (Tex. App.—Houston [14th
Dist.] 2005, no pet.).  Father had also
failed to provide stable housing for the children.  His future at the time of trial was, at best,
uncertain.  Father admitted that if the
children were released to him on the day of trial, he would not be able to
provide housing for them.  Father initially
refused services offered by DFPS. 
Although he was financially unable to care for his children, he did not
get the identification needed to obtain food stamps and WIC.  He also failed to complete the paperwork to
enroll his children in daycare.  He did
not explain why he did not follow through with the actions necessary to obtain
the benefits for his children.  Father
allowed the children to remain in homemade diapers full of waste.  Even when provided clothing, he did not
adequately dress them.  Even when warned
of the dangers of “propping” an infant’s bottle up while she drank, he
continued to endanger the child by feeding her in that fashion.

Each parent repeatedly committed
criminal acts that subjected them to the possibility of incarceration.  While imprisonment alone is not a basis to
terminate parental rights, it is an appropriate factor to consider.  See
In re M.R.J.M., 280 S.W.3d 494, 503
(Tex. App.—Fort Worth 2009, no pet.). 
Each time these parents were jailed, they were absent from their
children’s lives and unable to provide a home or support, which negatively
impacted the children’s living environment and emotional well-being.  Id.,
see In re C.L.C., 119 S.W.3d 382, 393
(Tex. App.—Tyler 2003, no pet.) (holding that it is
sufficient that the parent was aware of the potential for danger to the child
and disregarded that risk). 

We have reviewed the evidence
thoroughly.  The clear and convincing evidence
supports the trial court’s finding that the environment provided for the children,
under both Mother’s and Father’s care, endangered the physical or emotional
well-being of their children.  Further,
the clear and convincing evidence supports the trial court’s finding that each
parent engaged in a course of conduct that endangered their children.  Accordingly, we hold that the evidence is
both factually and legally sufficient to support the trial court’s termination
findings under subsections 161.001(D) and (E) as to both parents.  We overrule Father’s two issues and Mother’s
second and third issues.

IV.  Jurisdiction
Issue

 

Mother also complains that the
trial judge in the 324th District Court improperly presided over the trial and
hearing on Appellants’ motions for new trial. 


The 325th District Court of Tarrant
County has continuing and exclusive jurisdiction over this matter by virtue of
issuing an order establishing the parent-child relationship in November
2005.  See Tex. Fam. Code Ann. § 155.001(a) (Vernon 2008).  However, the termination proceeding was heard
by Hon. Jerry S. Hennigan, presiding judge of the 324th District Court.  The record indicates that there were
“scheduling conflicts” that prevented the judge of the 325th District Court to
hear the case.  At the hearing on the
motions for new trial, Judge Hennigan explained that Judge Wells of the 325th
District Court had “sent out an e-mail asking somebody to hear it because of
the [scheduling] issues.”  When Mother
argued at the hearing that the motions should be heard by the 325th District
Court because of its continuing, exclusive jurisdiction over the case, Judge
Hennigan explained that the case remained in the 325th District Court and that
“the 324th is not assuming jurisdiction of this case.”  Mother argues that without a motion for
recusal or a motion to transfer, the 324th District Court abused its discretion
by hearing the case. 

To determine whether a trial court
abused its discretion, we must decide whether the trial court acted without
reference to any guiding rules or principles; in other words, we must decide
whether the act was arbitrary or unreasonable. 
Low v. Henry, 221 S.W.3d 609, 614 (Tex. 2007); Cire v.
Cummings, 134 S.W.3d 835, 838–39 (Tex. 2004).  Texas law grants broad power to district
courts to act for one another.  In re U.S. Silica Co., 157 S.W.3d 434, 439 (Tex. 2005).  The Texas Constitution allows district judges
to “hold courts for each other when they may deem it expedient.”  Tex. Const. art. v, § 11.  The Texas Government Code states that judges
in counties with two or more district courts “may, in their discretion,
exchange benches or districts from time to time.”  Tex. Gov. Code Ann. § 24.303(a) (Vernon 2004).  The government code also states, 

A
district or statutory county court judge may hear and determine a matter
pending in any district or statutory county court in the county regardless of
whether the matter is preliminary or final or whether there is a judgment in
the matter.  The judge may sign a
judgment or order in any of the courts regardless of whether the case is
transferred.  The judgment, order, or
action is valid and binding as if the case were pending in the court of the
judge who acts in the matter.

 

Id.
§ 74.094(a).  Lastly, our rules of civil
procedure state, 

Where
in such county there are two or more district courts having civil jurisdiction,
the judges of such courts may, in their discretion, exchange benches or
districts from time to time, and . . . any of them may in his
own courtroom try and determine any case or proceeding pending in
another court without having the case transferred . . . .

 

Tex. R. Civ. P. 330(e).

It is
therefore clear that a judge of the 324th District Court may hear and render
judgment in a case of the 325th District Court, without recusal or transfer out
of the 325th District Court.  It was well
within Judge Wells’s discretion to ask Judge Hennigan to hear the case, and it
was within Judge Hennigan’s discretion to preside over the proceedings.  Mother’s first issue is overruled. 

V. Conclusion

Having overruled both of Father’s
issues and all three of Mother’s issues, we affirm the trial court’s judgment.

 

                                                                   LEE
GABRIEL

                                                                   JUSTICE

 

PANEL:  
 
 
 
 
 
 
 DAUPHINOT, 
 
 
 
 
 
 WALKER, and 
 
 
 
 
 
 GABRIEL, JJ.       

 

DELIVERED:  November 10, 2010











[1]See
Tex. R. App. P. 47.4.